CHANCERY.

Case 19.

## Pope's Executors *vs* Elliott & Co.

ERROR TO THE LOUISVILLE CHANCERY COURT.

*Wills.  Devises.  Trusts.*

December 16.

Case stated.

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

IN June, 1842, Robert Pope, as the surety of Godfrey Pope, and jointly with him, executed to Elliott & Co. four notes of $1,000 each, payable in one, two, three and four years. In February, 1843, William Pope, the father of Godfrey and Robert, made his will, which was admitted to record shortly after his death in 1844.

In 1846, Elliott & Co. filed this bill against Godfrey and Robert Pope, and the executors of William Pope, alledging that Robert Pope had lately received under his father's will, a life estate of great value, which they pray may be subjected to their debt, of which a portion

of the first note only, appears to have been paid. By the will of William Pope, a provision is made for $25 a month, to be disposed of or appropriated for the support of Robert Pope; and it appears by the answer of the executors, that said Robert having been absent in the Rocky Mountains, the monthly instalments, amounting to $225 up to the first of May, 1846,. had accumulated in the executors hands. They make a question whether the $25 per month devised by the father of Robert, can be made the subject of attachment for the surety debt to the complainants, "to the avoidance of the object for which, and for which alone, it was given." Robert Pope was proceeded against as an absent defendant and did not answer.

In October, 1846, a decree was rendered directing the executors to pay to the complainants, towards the discharge of the notes above mentioned, the sum of $350, which had accumulated up to the first day of October, 1846, and also to pay the further sum of $25 at the end of each and every month, from the said first day of October, during the life of said Robert, or until the said debt is fully discharged, reserving to the executor the right to show the failure of the trust fund in exonera-. tion of his future liability. The basis of the decree is, that Robert Pope is, by the will of his father, entitled to $25 a month during life, out of a trust fund in the hands of the executors, and that this $25 a month may be subjected by a Court of equity, to the satisfaction of any debt of Robert, whose non-residency and absence from the State, are alledged as special grounds for resorting to the Court. It is contended in opposition to the decree, that Robert Pope has no such interest in trust, under the will, as can be thus disposed of. This depends upon the fair construction and legal operation of the will.

After devising his slaves, (except two which he desires to be emancipated,) to a grand-son, R. C. A., on his attaining twenty two years of age, the testator gives all the residue of his estate to his executors in trust, empowering them or the survivor, to sell his real estate. The fourth clause of the will is as follows: "Fourth.

*Margin notes:*
POPE'S EX'ORS.
vs
ELLIOTT & Co.

Decree of the Circuit Court.

The substance of W. Pope's will.

POPE'S EX'ORS.
*vs*
ELLIOTT & Co.

All the proceeds of my personal estate, the debts due me, the avails of my real estate, the hire or labor of my slaves until distribution, I wish disposed of as follows, viz: annually a sufficient sum to educate and support my grand-son, R. C. A.; for the support of my son, James Pope, twenty five dollars per month; for the support of my son, Robert Pope, twenty five dollars per month; for the support of my son W's. family and education of his children, one thousand dollars per annum; for the support of my son G's. family, six hundred dollars per annum," &c., and directs a sale of land, if necessary, to make up these sums. The fifth clause states the advancements made to the testator's children at nearly $75,000, and states his intention to keep an account of future advancements. The sixth clause directs that on or after the first day of January, 1851, the executors, or the survivor, shall place at interest, the interest to be paid semi-annually, a sum sufficient to produce three hundred dollars per annum, "which interest they are to appropriate to the support of my son, James Pope, as long as he lives, and a like sum in like manner, for the support of my son, Robert Pope, as long as he lives. And in no event is either my son James or my son Robert, to have or receive any other portion of my estate, or the profits thereof, but each the three hundred dollars during life." At the death of James, the money placed at interest for his support, is given to the son W's. children, and at the death of Robert, the money placed at interest for his support, is given to the grand-son, R. C. A., and the children of the son G. All the estate to which Robert would have been entitled, had an equal portion been willed to him, is given, one half to the grand-son above named, and the other half to the children of G.; and all to which James would have been entitled, if an equal portion had been willed to him, is given to the children of W.; the residue of the estate to be equally divided—one third to go to the children of W., one third to the children of G., and one third to the grand-son, R. C. A., subject, in each case, to a deduction for advancements made to the parents respectively.

It appears from this synopsis of the will, that the testator gave nothing to be at the absolute disposal of either of his sons, and in fact gave nothing directly to either; that after providing for the support of two of his sons, who may be assumed to have been unmarried, and for the families of two who were married, the entire residue is disposed of among his grand children; and that the two sons, James and Robert, are in effect, cut off from an equal participation in the estate, and to have nothing more than the support to be furnished to each from the sum of $25 a month, amounting to $300 a year, allowed for that purpose. It is to be observed too, that this sum is not directed to be paid to each or either of them generally, but by the 4th clause, of the estate which is held in trust, $25 per month is to be disposed of, (by the trustees of course,) for the support of each; and by the 6th clause the executors, (the trustees,) are to appropriate $300 a year, that is the same $25 a month, to the support of each. It was evidently the intention of the testator, and it is, as we think, the clear meaning of the will, not to put money in the hands either of James or Robert to spend as they please, but to secure to each a competent personal support, by placing an estate in the hands of trustees, with directions to appropriate or dispose of $25 a month for the support of each. The will imposes upon the executors the trust and duty of appropriating $25 a month or $300 a year, to the support of Robert. The general character of the will and the nature of this particular provision, show that the testator had not confidence in the prudence or discretion of Robert, and therefore, he places in the hands of others the means, and imposes on them the duty of supplying his support. This duty they owe not only to the beneficiary, but to the testator, and to the law, if the devise is effectual according to the intention of the will. Could the executors rightfully compound with Robert and pay to him at any time, the estimated value of $25 a month during his life, or put the principal sum in his hands upon security for re-payment at his death? Could they properly pay, or would the Chancellor compel them to pay

to the assignee of Robert, such estimated value or the principal sum, or even the twenty five dollars a month, without any security for the support of Robert? Would they discharge their duty under the will, by paying even into Robert's own hands, at the beginning of every month, the sum of $25, unless they had sufficient reason to believe it would be appropriated to his support, or would not be required for that purpose?

Where a testator provided by his will a fund of $25 per month for the support of a son, and placed it in the hands of a trustee for the son, & imposed upon the trustee the duty of supplying the support.— Held that the trustee could not without violating the trust, commute payment, nor could the Chancellor decree the payment of any part of the monthly support, which was not fully due, to the payment of a debt for which the *cestui qve trust* or beneficiary was surety.

It being clear that the testator intended to provide in the hands of his executors, a support or the means of support for Robert during his life, to the extent of $25 a month, or $300 a year, and that the executors were confided in for the appropriation of this sum for his support, it is obvious that any alienation of the fund to a different object, leaving the designated purpose unaccomplished and unsecured, is a violation of the will of the testator, and of the duties of the executors if concurred in by them; and that consequently, the beneficiary himself, has not, according to the will, any right so to alienate it. It cannot be doubted then, that this decree diverting the fund altogether from its intended objects, compels the executors to a violation of the testator's intention, and in fact breaks up the provision of the will on this subject. It being in general the province of the Chancellor to execute trusts and wills according to their intention, and the intention being in this case sufficiently manifest, the decree can only be sustained, if at all, on the ground either that the intention is contrary to law or public policy, or that the provisions made in the will for carrying it out, are insufficient or are calculated to defeat it.

There is nothing immoral or unconscientious in a father providing a trust fund for the support of his child, which shall not be made liable by the Chancellor to pay the debts of the son.

The only principles of law or policy appealed to in support of the decree, are those which subject the debtor's property, legal and equitable, to the payment of his debts. But these principles do not subject the father's property to the debts of the son, nor give to the creditors of the son any right to complain that the father has not left or placed his property within their reach. Nor are they injured by a provision which may secure the application of the father's property to the support of his son. If the provision be not extravagant or unrea-

sonable, as it seems not to be in this case, there is nothing immoral or unconscientious in it so far as regards the creditors of the son; and we think there is no good ground in equity, for diverting the means thus provided, from the intended purpose for their benefit, further than is required by a fair construction and application of the positive law.

The 13th section of the act of 1796, (*Stat. Law*, 443,) has been referred to as decisively sustaining the decree. That section enacts that estates of every kind holden in trust, shall be subject to the like debts and charges of the person for whose use or benefit they are holden, as if he owned the like interest in the thing holden, as he owns in the uses or trusts thereof. What then is the estate or thing holden in trust in this case? What is it that is subjected by the statute to his debts and charges? Is it the estate or thing, rents, hires, debts, and other means of the estate out of which the $25 a month is to issue? Then, according to this statute, it is the rents, hires, debts, &c., which to the extent of Robert's interest in the trust, are subject to the like debts and charges as if he held the things themselves, or it is the sum of money which produces the $25 a month, or $300 a year. And it has been decided that where a slave is held in trust to apply the proceeds of his hire to the maintenance of the *cestui que trust*, the slave, and not the annual hire, is subject to execution: *Eastland* vs *Jordan*, (3 *Bibb*, 186.) If the estate or thing holden in trust, was that out of which the $25 a month is to issue, then it would seem that the principal sum or estate, and not the profits or interest, should be subjected. And as to the profits, it is clear that they are not the thing holden in trust until they are actually received, and it would seem, therefore, that no more than the sum actually in hand should be subjected under the statute.

But as was decided in the case of *Cosby* vs *Ferguson*, (3 *J. J. Marshall*, 264,) neither the principal sum, if the thing holden in trust be money or choses in action, nor the monthly or semi-annual interest can be subjected by the mere force of the statute which has been quoted, and it is only in virtue of other statutes, that an interest

POPE'S EX'ORS.
*vs*
ELLIOTT & Co.

—This is not in conflict with the statute making subject estates holden in trust to the payment of the debts of the *cestui que trust*.

The statute of 1796 did not intend to subject money held in trust, to the payment of the debts of *cestui que trust*. The act of 1821 goes further, and was

POPE'S EX'ORS.
*vs*
ELLIOTT & Co.

an extension of
the power of the
Chancellor in
subjecting equi-
ties to sale.

of that kind can be reached by the creditor. And this proves what we think is obvious from the language of the section which has been quoted, as well as from the general subject and object of the statute in which it is found, that money held in trust was not intended to be subjected to the debts of the *cestui que trust* by this 13th section. If the statute had been understood as subjecting money held in trust for the use or benefit of a debtor, the Courts of equity in this State would never have hesitated in furnishing a remedy by which the creditor might have the benefit of this subjection. And it would not have been necessary to appeal to the act of 1821, subjecting choses in action and equitable interests to the satisfaction of judgments which could not be collected by execution, as the only authority for subjecting the interest of Cosby, in the case last referred to. The reference in that case, (3 *J. J. Marshall,* 265,) to the 13th section of the act of 1796, would seem to have been made only for the purpose of showing that it did not apply where the subject of the trust was not such as could be taken and sold under execution. And it is expressly decided that Cosby's interest would have been intangible by his creditors, but for the act of 1821. That act, however, gives no remedy in the present case, and is not applicable to it, because there has been no judgment and execution against Robert Pope, but he is proceeded against upon the original liability as a non-resident or absent defendant. For the same reason the 37th section of the execution law of 1828, is inapplicable. We must therefore look to the statutes by which the proceeding against non-resident or absent defendants is regulated, in order to ascertain the mode and extent of the relief which they authorize, and to determine whether they bring within the reach of the creditor, the particular subject or thing now sought to be appropriated to his demand.

Neither the stat-
utes of 1796 or
1837, authori-
zing proceedings
against non-resi-
dent or absent
defendants, au-

Two statutes only relate to this remedy, that of 1796, (1 *Stat. Law,* 91,) and that of 1837, (3 *Stat. Law,* 12.) The first provides only for reaching debts due by a resident to a non-resident or absent debtor, or effects of the latter in possession of the former in this State. The

last extends the remedy, (or adopts the extension previously made,) so as to embrace lands, as well as debts and effects. Neither of these statutes uses the terms choses in action or equitable interests in describing the subject or thing against which the remedy is given, but only lands, debts and effects. The bill under these statutes, operates as an attachment restraning the resident defendant from paying the debt to the non-resident, and from disposing of his effects in possession here.

What debt then did the executors of Wm. Pope owe to Robert Pope, or what effects of his were in their hands when this bill was filed or when the decree was rendered? Certainly the estate of Wm. Pope, given in trust to his executors for the purpose of raising the various sums disposed of by the will, were not the effects or the estate of the persons who were to receive those sums. And if the executors were and are indebted to Robert Pope to the extent that the $25 a month directed to be appropriated to his support, may at any time have accumulated in their hands, we are of opinion that, prospectively, they are not and cannot be said to be indebted to him in any sum of money—that they are under no obligation to pay him $25 a month in future, but only to appropriate that sum to his support, and that if they are under any obligation to pay to him any portion of that sum, it is only so much of it as may not be required for his support, and to which he may become entitled only on that ground, or because having provided otherwise for his own support, he should be compensated therefor out of the fund appropriated for that purpose, to the extent of $25 a month. To this extent the executors are bound to furnish the means of support, and to the same extent he has a right to demand it of them every month. This is not a debt to him of $25 a month during life, but a duty to appropriate out of the estate of the testator in their hands, that sum for his support. What they owe is a support and not money. The money will be in their hands, not for his use, but for their use in furnishing him a support, as the testator has directed, until or unless by supporting himself otherwise, he may become entitled to a portion

thorize a proceeding against any thing in the hands of a resident debtor of the absent debtor but *lands, debts or effects*, which do not embrace a monthly support provided for the absent debtor by the will of his father, to be paid by his executor.

POPE'S EX'ORS.
vs
ELLIOTT & Co.

of it.   It is only on the contingency that the money is
not appropriated for his support, that it becomes his.
And it must be his before his creditors become entitled
to it as a debt due or to become due to him, or as effects
of his in the hands of the executors.   True he has an
interest in the appropriation which is to be for his ben-
efit.   But these statutes do not subject every possible
interest to the remedy which they give.   A husband
has an interest in the appropriation of money held in
trust for the support of his family or the education of
his children; but surely the law will not seize such a
fund for the payment of his debts, unconnected with the
object of the trust, when it has been provided by one
who was in no manner bound for them.   Suppose that
a father devising an estate to one son, should direct or
require that another son should, at all times, be allowed
to eat at his table or sleep in his house, free from ex-
pense, or that the first should furnish clothing to the
other, when needed.   Is there, so long as the direction
is faithfully complied with, any debt, or are there any
effects of which the Chancellor can lay hold under these
statutes, to satisfy the creditors of the son thus provi-
ded for?   Or is there any thing which, as a chose in
action, or equitable interest in any estate, real, personal
or mixed, can be subjected even under the act of 1821
or 1828, to the satisfaction of a judgment which cannot
be coerced by execution?   Our laws exempt even from
the grasp of an execution, many articles of visible prop-
erty actually in possession of the debtor, and undoubted-
ly his own, on the ground of their being essential to the
present support or comfort of himself and family.   Do
they then require the Chancellor to take the clothes
from his back and the food from his mouth, or to deprive
him of a provision made by his father, not for supplying
him with money or with property, but with necessary
food and clothes?   We say that in such a case as has
been supposed, there is no duty on the one side but that
of complying with the direction, and no right on the
other but that of demanding and receiving a compli-
ance, and a right of demanding compensation for non-
compliance.   This last right may be a debt or chose in

action, accessible to creditors. But they have no right to coerce a breach of duty in order to create this debt, and we perceive no principle on which the Chancellor should do it for them. Until there is a breach of duty on the one side or a right on some ground to demand a commutation or compensation on the other, there is, in our opinion, no debt or chose in action accessible to creditors, and it cannot reasonably be said that one party has any effects or estate of the other, or in which the other has an interest legal or equitable.

If in the will before us the testator had directed the executors to support Robert out of his estate in their hands, without specifying the sum to be appropriated to that purpose, the case would be substantially the same as the one just supposed. The means of furnishing the support would not be his while in the hands of the executors. And as he would have no right but that of receiving and requiring a support for himself, there would seem to be nothing either in his right or in the corresponding duty which could, by the decree of a Court, be transferred or appropriated to the creditors of the beneficiary, in payment of debts unconnected with his support, without violating rights which the creditors have no right to disturb. Such a bequest or devise, is obviously different from a devise of property or money in trust, for the use or benefit of an individual and from a devise of specific property in trust, to apply the proceeds or profits to his support. These devises give a direct interest in some specific subject or in a particular sum of money. The direction that the executors having a large estate of the testator shall, among other things, support a particular individual, out of the means in their hands, gives to the beneficiary no such interest. And the direction to appropriate a specific sum for his support, differs in no respect from the simple direction to support him, except that it prescribes a limit to the appropriation, and may, perhaps, imply that so much of it as may not be requisite for the object expressed, is still intended for the same individual. In that case it would be held for his use, and being his, would be subject to the payment of his debts under the

POPE'S EX'ORS.
*vs*
ELLIOTT & Co.

statutes subjecting the debts and effects of non-resident and absent debtors. Whether the Chancellor, in case the allowance were extravagant, might ascertain and appropriate the excess, is a question not arising in this case. Nor is the question directly presented whether if a specific sum were placed in the hands of trustees to apply the interest to the support of a particular individual, the fund or its interest might be diverted wholly from that object. The question before us arises upon the will as applied to the present condition of the estate. And we are of opinion that the decree has gone too far in appropriating to the complainants' demand, any part of the allowance of $25 per month beyond the accumulations in the hands of the executors at the date of the decree, as ascertained by their answer, or as might have been ascertained by enquiry, to be made by the master, in which the executors or either of them, might be examined on oath. According to the principles of this opinion, the attachment operated only upon the accumulations in the executors' hands at the filing of the bill, and the executors might have appropriated the monthly allowance accruing afterwards, to the object provided for by the will. The answer shows that this had not been done up to the time when it was filed. And it may not have been done afterwards; and as the bill seeks to subject a sum accruing periodically, we are inclined to the opinion that so much as had actually accrued and remained unappropriated at the hearing, might have been decreed to the complainants; and that their right will be the same upon the return of the cause.

Wherefore, the decree is reversed and the cause remanded for proceedings and decree in conformity with this opinion.

*Guthrie* for plaintiffs; *Loughborough and Bridges* for defendants.